UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

            Plaintiff,                       Case No. 10-20169

v.                                    Hon. Nancy G. Edmunds

TONY POWELL,

            Defendant.

_____/

## OPINION AND ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS [24]

This matter comes before the Court on Defendant's motion to suppress evidence seized and statements made in violation of Defendant's constitutional rights, pursuant to Federal Rules of Criminal Procedure 12. For the reasons set forth below, Defendant's motion is DENIED.

## I.   Facts

In November 2009, Special Agent Michael Yott with the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) began investigating Defendant Tony Alonza Powell (Defendant), "who [wa]s alleged to be involved in the distribution of [h]eroin." (Pl.'s Resp., Ex. A ¶ 4, 6.) At that time, Defendant was allegedly residing at 2956 Marlborough Street, Detroit, Michigan and was also allegedly utilizing an apartment located at One Lafayette Place, The Pavilion, # 1501, Detroit, Michigan "to store, package and distribute heroin." (Pl.'s Resp., Ex. A ¶ 4.)

Between December 2009 and March 2010, ATF agents utilized a confidential informant to facilitate six separate controlled purchases of heroin from Defendant. (*See* Pl.'s Resp., Ex. A.) Defendant allegedly sold heroin to the informant on each of those occasions. For each of the controlled purchases, law enforcement officers conducted surveillance of the meeting between the informant and Defendant and debriefed the informant immediately afterwards. The details of each purchase, the connection to the Marlborough Street residence and the Lafayette Place apartment, and other information gleaned from the investigation are set forth in the application for the warrants.

> A confidential informant provided information to ATF that Defendant was selling illegal narcotics. The informant provided ... details regarding Defendant's Lafayette Place apartment, vehicle, and cell phone. (*See* Pl.'s Resp., Ex. A at ¶ 6.) This [particular] informant had "provided information to [ATF] numerous times resulting in the issuance of both State and Federal Search Warrants which result[ed] in the seizures of illegal narcotics and firearms. All information provided that was investigated was found to be true and correct, and therefore reliable." (*Id.* at ¶ 5.)

> At the outset of the investigation, a review of Defendant's criminal history revealed that he had previously been arrested "five ... times relating to the illegal distribution of narcotics," two of which "resulted in [criminal] convictions." (*Id.* at ¶ 7.)

> The first controlled purchase of heroin from Defendant took place on December 14, 2009. On that date, the confidential informant contacted Defendant, who directed the informant to a pre-determined meet location. Special Agent Joseph Secrete established surveillance outside the Lafayette Place apartment complex, and shortly after the conversation between the informant and Defendant, observed Defendant leave the Lafayette Place apartments and proceed directly to the meet location. Defendant met with the informant and sold him heroin. The informant was searched before the sale to ensure that he had no narcotics on his person and again searched after he turned the heroin that he bought from Defendant over to ATF to ensure that he had no additional narcotics or prerecorded funds on his person. The informant was kept in constant surveillance by ATF during this transaction. The informant confirmed that he purchased the heroin from Defendant. (*Id.* at ¶ 8.)

The second controlled purchase of heroin from Defendant took place on December 15, 2009. On that date, the confidential informant contacted Defendant, who directed the informant to a pre-determined meet location. Task Force Agent Thomas Bunch established surveillance outside the Lafayette Place apartment complex, and shortly after the conversation between the informant and Defendant, observed Defendant leave the Lafayette Place apartments and proceed directly to the meet location. Defendant met with the informant and sold him heroin. The informant was searched before the sale to ensure that he had no narcotics on his person and again searched after he turned the heroin that he bought from Defendant over to ATF to ensure that he had no additional narcotics or pre-recorded funds on his person. The informant was kept in constant surveillance by ATF during this transaction. The informant confirmed that he purchased the heroin from Defendant. (*Id.* at ¶ 9.)

The third controlled purchase of heroin from Defendant took place on March 15, 2010. On that date, the confidential informant contacted Defendant, who directed the informant to meet him at the Lafayette Place apartment. ATF established surveillance outside the Lafayette Place apartment complex, and shortly after the conversation between the informant and Defendant, observed Defendant arrive at the Lafayette Place apartments. During a follow-up telephone call, Defendant directed the informant to apartment #1501, where Defendant sold him heroin. The informant was searched before the sale to ensure that he had no narcotics on his person and again searched after he turned the heroin that he bought from Defendant over to ATF to ensure that he had no additional narcotics or pre-recorded funds on his person. Aside from the time that the informant was inside the apartment building, he was kept in constant surveillance by ATF during this transaction. The informant confirmed that he purchased the heroin from Defendant. (*Id.* at ¶ 10.)

The fourth controlled purchase of heroin from Defendant took place on March 22, 2010. On that date, the confidential informant contacted Defendant, who directed the informant to meet him at the Lafayette Place apartment. ATF established surveillance outside the Lafayette Place apartment complex, and shortly after the conversation between the informant and Defendant, observed Defendant arrive at the Lafayette Place apartments. Defendant entered the building with the informant. Once inside, they proceeded to apartment #1501, where Defendant sold the informant heroin. The informant was searched before the sale to ensure that he had no narcotics on his person and again ... after he turned the heroin that he bought from Defendant over to ATF to ensure that he had no additional narcotics or pre-recorded funds on his person. Aside from the time that the informant was inside the apartment building, he was kept in constant
surveillance by ATF during this transaction. The informant confirmed that he

purchased the heroin from Defendant. (*Id.* at ¶ 11.)

After the fourth controlled purchase, ATF maintained surveillance of Defendant as he left the Lafayette Place apartment. Defendant "was observed to travel to several places, meet with persons for a short period of time, and depart." The affiant stated that, based on his training and experience, such behavior was consistent with persons involved in the distribution of illegal narcotics. After Defendant sold heroin to the informant and made multiple stops indicative of drug dealing, surveillance observed Defendant drive to the rear of ... [the] Marlborough Street home and park his car in the home's garage. (*Id.* at 12.)

The fifth controlled purchase of heroin from Defendant took place on March 24, 2010. On that date, ATF established surveillance at ... [the] Marlborough Street home, where they observed Defendant and an unknown female exit the home and drive directly to the Lafayette Place apartments. Defendant and the unknown female departed the apartment building after a short while. The confidential informant then contacted Defendant, who directed the informant to meet him at the Lafayette Place apartment. ATF established surveillance outside the Lafayette Place apartment complex, and shortly after the conversation between the informant and Defendant, observed Defendant arrive back at the Lafayette Place apartments. Defendant entered the building with the informant. Once inside, they proceeded to apartment #1501, where Defendant sold the informant heroin. The informant was searched before the sale to ensure that he had no narcotics on his person and again ... after he turned the heroin that he bought from Defendant over to ATF to ensure that he had no additional narcotics or pre-recorded funds on his person. Aside from the time that the informant was inside the apartment building, he was kept in constant surveillance by ATF during this transaction. The informant confirmed that he
purchased the heroin from Defendant and stated that he observed Defendant place the buy money in his pocket [and that he observed "additional narcotics not purchased ... inside the apartment along with a scale and miscellaneous narcotic packaging material."] (*Id.* at ¶ 13.)

The sixth and final controlled purchase of heroin from Defendant took place on March 26, 2010. On that date, the confidential informant contacted Defendant to arrange a purchase of heroin. ATF established surveillance at ... [the] Marlborough Street home, where they observed Defendant exit the home alone and drive directly to the Lafayette Place apartments shortly after the conversation with the informant regarding a heroin sale. The informant then called Defendant, who directed the informant to meet him at the Lafayette Park apartment. Once the informant arrived, he and Defendant entered the building together. Once inside, they proceeded to apartment #1501, where Defendant sold the informant heroin. The informant was

> searched before the sale to ensure that he had no narcotics on his person and again searched after he turned the heroin that he bought from Defendant over to ATF to ensure that he had no additional narcotics or pre-recorded funds on his person. Aside from the time that the informant was inside the apartment building, he was kept in constant surveillance by ATF during this transaction. The informant confirmed that he purchased the heroin from Defendant and stated that he observed Defendant place the buy money in his pocket and leave the building with the money. (*Id.* at ¶ 14.)

(Pl.'s Resp. at 2-5; *see also* Pl.'s Resp., Ex. A.) As described in the affidavits, "members of ATF Group II were involved in the surveillance of [each] controlled purchase of suspected heroin [from] Powell with the assistance of [the informant]." (Pl.'s Resp., Ex. A at ¶¶ 8, 9, 10, 11, 13, 14.) ATF agents also conducted an intelligence check of the residence at 2956 Marlborough, Detroit, Michigan which indicated that the home was owned by Willmon Powell, and the agents later discovered that Willmon has been affiliated with numerous addresses associated with Defendant. (*Id.* at ¶ 15.)

The affidavits, in the final two paragraphs, also provide that, based on the affiant's training and experience, "persons involved in the distribution of large amounts of illegal narcotics regularly store and maintain large amounts of proceeds and records generated through the course of the illegal distribution network in their residence as well as other places used in the illegal distribution operation," (*id.* at ¶ 16), and that "persons involved in the illegal distribution of narcotics use and maintain different places to conduct sales, packaging and storage of the illegal narcotic proceeds and narcotic distribution equipment," (*id.* at ¶ 17).

Shortly after the sixth and final controlled purchase, ATF obtained search warrants for the Lafayette Place apartment and the Marlborough Street residence, both located in Detroit. And, on April 1, 2010, ATF agents executed the warrants. The ATF agents seized

approximately 225 grams of heroin, packaging material, scales and a large narcotics press from the apartment. At the Marlborough Street residence, agents seized a loaded handgun and approximately $57,000 in cash, some of which allegedly matched the pre-recorded buy money supplied to Defendant during one of the controlled purchases.

Defendant was arrested and charged by Indictment with three counts including: (1) Felon in Possession of a Firearm, in violation of 18 U.S.C. § 922(g)(1); (2) Possession with the Intent to Distribute 100 or More Grams of Heroin; Aiding and Abetting, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2; and (3) Maintaining Drug-Involved Premises, in violation of 21 U.S.C. § 856.[1] (First Superceding Indictment [Docket Text # 10].) Defendant was not, however, charged with the six controlled purchases that were made by the informant.[2]

This matter comes before the Court on Defendant's motion to suppress evidence seized and statements made in violation of Defendant's constitutional rights, pursuant to Federal Rules of Criminal Procedure 12.

## II. Analysis

Defendant maintains that—in the procurement and execution of the search warrants—his constitutional rights were violated and, thus, seeks to suppress the evidence seized and statements made during the searches. In his motion, Defendant offers three

---

[1] The First Superceding Indictment also includes Forfeiture Allegations against Defendant pursuant to 18 U.S.C. § 924(d)(1) and 21 U.S.C. § 853. (First Superceding Indictment [Docket Text # 10].)

[2] The government did not charge Defendant with the controlled purchases because it fears for the safety of the informant. The government does not anticipate calling the informant to testify at trail and maintains that his identity should remain protected.

arguments to support suppression. First, Defendant challenges the validity of the warrants contending that the affidavits: (1) did not establish probable cause to justify the issuance of the warrants; and (2) contained false or misleading statements. Second, Defendant maintains that the searches were not conducted in a reasonable manner. Third, Defendant argues that he was not advised of his Miranda rights prior to ATF's interrogation of him and, thus, any incriminating statements made must also be suppressed.

The Court address Defendant's arguments pertaining to the validity and execution of the search warrants followed by his argument regarding Miranda violations.

## A. Fourth Amendment Protection Against Unreasonable Searches and Seizures

The Fourth Amendment to the Constitution provides "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. Amend. IV. In *Payton v. New York*, 445 U.S. 573 (1980), the Supreme Court held that "[i]t is a basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable." *Id.* at 576 (internal quotation omitted); *see also Katz v. United States*, 389 U.S. 347, 357 (1967) (holding that a warrantless search is "per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions").

### 1. Validity of the Search Warrants

Defendant maintains that the ATF agents improperly entered the Marlborough Street residence and the Lafayette Place apartment, and thus all evidence seized should be suppressed as the fruit of an illegal entry and search. In support of his motion to suppress, Defendant argues that the search warrants were invalid because: (1) "there was no credible

information contained within the affidavits which justified the issuance of the warrants"—"[t]hey were bare bones affidavits, which provided little in the way of probable cause to justify a search," (Def.'s Mot. at 8); and (2) "the search warrant affidavits contain misleading statements ... [that] were material to the issuance of the warrant," (Def.'s Mot. at 13). Additionally, Defendant contends that the good faith exception to the exclusionary rule does not apply because "it is unreasonable to believe that the agents could have been operating under the good faith belief, that the warrants justified entry into the residences, when they knew their affidavits did not contain information that narcotics were being stored within the residences." (Def.'s Mot. at 9.)

### a. Sufficiency of Affidavits[3]

Defendant contends that—because the allegations in the affidavits were insufficient to establish probable cause to search the Marlborough Street residence and the Lafayette Place apartment—the government violated his Fourth Amendment rights against unreasonable searches and seizures.

> The agents had no reasonable basis to believe that the information provided by the informant rose to the level of probable cause. In fact, the statements attributed to the informant were neither indicative of probable cause, or even a reasonable grounds to believe that contraband would be found within the

---

[3] Defendant also requests this Court to "conduct an evidentiary hearing where the issues can be more fully developed." (Def.'s Mot. at 24.) Defendant questions whether the affidavits accompanying the search warrants were sufficient to establish probable cause to believe that evidence of drug trafficking would be found in the Marlborough Street residence and the Lafayette Place apartment. To determine whether probable cause was lacking, the Court is tasked with examining the four corners of the search warrants without regard to extraneous testimony from the affiant or any other law enforcement officer. *See United States v. Coffee*, 434 F.3d 887, 892 (6th Cir. 2006) ("Review of the sufficiency of the evidence supporting probable cause is limited to the information presented in the four corners of the affidavit."). As such, there is no need for testimony beyond what is contained in the affidavits.

residences. Therefore, the agents could not have been operating under a good faith reliance on the issuance of the warrants. The agents knew or should have known that, they did not have historical information which confirmed their suspicion, that the Marlborough residence was the locus of any criminal activity. They knew, or should have known, that the [informant]'s information should have been corroborated beyond mere verification of easily obtainable public information. They knew that their representations, about the probability of drugs being stored and distributed from both locations, were contradictory and disingenuous.

(Def.'s Mot. at 8-9.) Defendant concludes that—because "the affidavits in support of the search warrants were so lacking in probable cause that any reasonable law enforcement [officer] would question the efficacy of their issuance"—"all evidence (physical as well as statements) obtained as a result of the illegal entries should be suppressed." (*Id.* at 13.)

To determine the sufficiency of an affidavit, courts evaluate whether the magistrate had a substantial basis for finding that the affidavit established probable cause to believe that the evidence described would be found at the places to be searched. *United States v. Greene*, 250 F.3d 471, 478 (6th Cir. 2001) (internal quotations omitted). Probable cause exists when there is "a fair probability, given the totality of the circumstances, that contraband or evidence of a crime will be found in a particular place." *United States v. Davidson*, 936 F.2d 856, 859 (6th Cir. 1991) (internal quotation and citation omitted); *see also Illinois v. Gates*, 462 U.S. 213, 236 (1983); *Allen*, 211 F.3d at 973. The Court also reviews the sufficiency of the affidavits in a commonsense manner rather than in a hypertechnical manner. *Allen*, 211 F.3d 973; *Greene*, 250 F.3d at 478. A magistrate's determination of probable cause is afforded great deference by the reviewing court. *United States v. Allen*, 211 F.3d 970, 973 (*en banc*) (6th Cir. 2000); *Greene*, 250 F.3d at 478. As such, the magistrate's exercise of discretion should not be set aside unless the discretion was arbitrarily exercised. *Allen*, 211 F.3d at 973; *Greene*, 250 F.3d at 478.

When evaluating information supplied by confidential informants, the factors of the informant's credibility, reliability, and basis of knowledge are considered. *See Gates*, 462 U.S. at 230; *Allen*, 211 F.3d at 972-73. These factors are highly relevant in assessing the value of an informant's information, but they should not be understood as being "entirely separate and independent requirements to be rigidly exacted in every case." *Gates*, 462 U.S. at 230. A deficiency in one of these factors may be compensated for by a strong showing as to another factor. *Id.* The overall credibility of the informant's information may, in certain circumstances, not even require police corroboration to support a finding of probable cause. *Allen*, 211 F.3d at 976 (holding that "where a known person, named to the magistrate, to whose reliability an officer attests with some detail, states that he has seen a particular crime and particular evidence, in the recent past, a neutral and detached magistrate may believe that evidence of a crime will be found").

After reviewing Agent Yott's affidavits and considering the totality of the circumstances, this Court concludes that the magistrate who issued the search warrants had a substantial basis for finding that there was a fair probability that evidence of criminal activity would be found at both the Marlborough Street residence and the Lafayette Place apartment. In other words, the affidavits established probable cause. The affidavits supporting the search warrants set forth Defendant's drug dealing activities and facts connecting those activities to both the apartment and the residence.[4] Not only do the

---

[4] In his brief, Defendant lists a number of items that he believes the agents should have done before seeking the warrants.

> (1) there were no averments that the informant's information had resulted in the arrest and successful prosecution of individuals engaged in criminal activity; (2) there were no averments that the agents had investigated all the information provided by the informant and that all of the information had been

affidavits support a finding that the confidential informant was a reliable and credible informant, but the affidavits also establish "a nexus between the place[s] to be searched and the evidence sought." *United States v. Carpenter*, 360 F.3d 591, 594 (6th Cir. 2004) (*en banc*) (internal quotations and citation omitted).

As set forth in the affidavits, the informant had personal knowledge of Defendant's criminal activity based on the controlled purchases. And, the information that the informant provided was corroborated by the surveillance and independent investigation undertaken by AFT. The affidavits also demonstrate that each of the controlled purchasers had some connection to the Lafayette Place apartment; the deals either took place in the apartment or surveillance observed Defendant leave the apartment before meeting the informant to sell him heroin. Each of the controlled purchasers had some connection to the Marlborough Street residence too.[5] For example, after the fourth controlled purchase, surveillance

determined to be ... reliable; ... (5) [sic] the agents never identified [Defendant] as an owner or occupier of either residence; (6) the agents never identified any vehicles associated with either residence; (7) the police never pulled trash from the Marlborough location to determine if contraband was being discarded; (8) the agents did not state that their investigation had established proof of residency or had revealed the likelihood that narcotics were being stored on the premises; (9) the agents knew that they had done little to corroborate the scant information that they had regarding the residences[; and] (10) the agents failed to investigate who was leasing [the] apartment.

(Def.'s Mot. at 14.) Some of these items, however, were in fact done. For example, there were averments in the affidavits that the informant had been utilized in the past with success and his information was deemed reliable upon investigation by ATF. (*See* Pl.'s Resp., Ex. A at ¶ 5.) Notwithstanding, hindsight scrutiny is not the standard under which this Court examines a search warrant. *See Allen*, 211 F.3d at 975 (holding that the appropriate analysis is "the adequacy of what [the affidavit] does contain, not on what it lacks, or on what a critic might say should have been added").

[5] Defendant contends that there was insufficient information contained in the search warrant to establish that he actually lived at the Marlborough Street residence. Regardless

observed Defendant engage in activity indicative of drug dealing before returning to the Marlborough Street residence; and before the final two controlled purchases, Defendant originated from the Marlborough Street residence before traveling directly to the meet location where he was to sell heroin to the informant. Moreover, the "common-sense conclusion here was that Defendant likely stored drugs, drug paraphernalia, or proceeds of his drug sales both where he resided ... and the apartment that he repeatedly used as a meet location for heroin sales," (Pl.'s Resp. at 9-10). *See Gates*, 462 U.S. at 231-32 (holding that law enforcement officers are entitled to formulate "common-sense conclusions about human behavior").

Courts that have examined similar circumstances have consistently held that an informant's observation of drug trafficking, even away from the dealer's home, can provide probable cause to search the dealer's house as well as other places used in the illegal distribution operation. *See, e.g., United States v. Frazier*, 423 F.3d 526, 532-33 (6th Cir. 2005); *United States v. Miggins*, 302 F.3d 384, 393-94 (6th Cir. 2002) (citing *United States v. Feliz*, 182 F.3d 82, 87-88 (1st Cir. 1999), which found that "it was reasonable to suppose that drug dealer stored evidence of dealing at home, even though no drug trafficking was observed to occur there"); *United States v. Remble*, No. 05-113-001, 2006 WL 462451, at *3 (S.D. Ohio Feb. 22, 2006) ("[O]nce there was evidence to demonstrate the [d]efendant's probable participation in drug trafficking there was probable cause to search his residence because drug dealers are likely to conceal evidence where they live."); *United States v.*

---

of whether Defendant actually lived at the Marlborough Street residence, the Court—as discussed below—finds that the affidavits established a sufficient nexus between the Marlborough Street residence and Defendant's drug activity.

*King*, 66 F.3d 326, 1995 WL 555640, at *2 (6th Cir. Sept. 19, 1995) (finding that probable cause to search house existed where "[t]he police observed defendant exit [a house], sell the informer cocaine, and return to the house[;] [t]hese observations support[ed] the conclusion that defendant was the man referred to in the tip, that he lived at [the house], and that he was using his house as a base to sell drugs"); *United States v. Blair*, 214 F.3d 690, 696 (6th Cir. 2000) ("In the case of drug dealers, evidence is likely to be found where the dealers live.") (internal quotations and citation omitted). While the Sixth Circuit has cautioned against using the "defendant's status as a drug dealer, standing alone, [as] giv[ing] rise to a fair probability that drugs will be found in his home," here—as set forth in the affidavits and as discussed above—there is a stronger connection to the Marlborough Street residence than his mere status as a drug dealer.[6] *Frazier*, 423 F.3d at 533.

This Court accordingly finds the magistrate did not arbitrarily exercise her discretion in issuing the search warrants: the magistrate correctly concluded that there was "a fair probability, given the totality of the circumstances, that contraband or evidence of a crime will be found" at both the apartment and the residence. *Davidson*, 936 F.2d at 859 (internal quotation and citation omitted).

---

[6] Additionally, this Court finds Defendant's reliance on *United States v. Leake*, 998 F.2d 1359 (6th Cir. 1993) misplaced. In *Leake*, the Sixth Circuit held that a search warrant was not supported by probable cause where the police, attempting to corroborate an anonymous informant's tip of drug dealing at a particular house, failed to observe any illegal activity or even any suspicious activity or otherwise corroborate the tip. *Id.* at 1365. But, an informant's tip otherwise insufficient to support the issuance of a search warrant may become sufficient if supported by appropriate police investigation. *United States v. Smith*, 783 F.2d 648, 650-651 (6th Cir. 1986). Here, as discussed above and as detailed in the affidavits, the AFT agents sufficiently corroborated the informant's information to support probable cause to search both the residence and the apartment. Thus, the affidavits in this case are far more robust than those in *Leake* and cannot legitimately be characterized as "bare bones."

### b. False and Misleading Statements

Defendant also contends that, in addition to a lack of probable cause, "the ... affidavits contain misleading statements ... [that] were material to the issuance of the warrant." (Def.'s Mot. at 13.) Specifically, Defendant argues that the conclusion paragraph contained in the affidavits—where Agent Yott states his belief that there was such probable cause—was false and misleading. Paragraph 18 of the affidavits provide:

> Based on the above information, I have probable cause to believe the [apartment] ... is being utilized as [a] location to distribute, store and maintain illegal narcotics to include heroin and is storing and maintaining narcotic proceeds and records of this illegal narcotics business. ...

> I further state that there is probable cause to believe that the residence ... is being utilized as a location from which illegal narcotics transactions are being initiated and that this residence is being used a as location to distribute, store and maintain illegal narcotics to include heroin and is storing and maintaining narcotic proceeds and records of this illegal narcotics business. ...

(Pl.'s Resp., Ex. A ¶ 18; *see also* Pl.'s Resp., Ex. A ¶¶ 16-17.) Defendant concludes that—given the false and misleading nature of these statements—the warrants are invalid and all evidence seized pursuant to it must be suppressed, and requests an evidentiary hearing in order to prove that knowing or reckless falsities negating good faith are contained in the affidavits. (*See also* Def.'s Mot. at 25 (requesting this Court to "conduct an evidentiary hearing where the issues can be more fully developed" and to conduct a "*Franks* Hearing to determine[] the truthfulness of certain statements within the affidavits in support of the issuance of the warrants").)

Under *Franks v. Delaware*, 438 U.S. 154 (1978), a defendant is not entitled to an evidentiary hearing—a *Franks* hearing—on the veracity of the statements in the affidavit unless he satisfies two requirements. The defendant must "make[] a substantial preliminary

showing" that: (1) a false statement was "knowingly and intentionally, or with reckless disregard for the truth" included by the affiant in a supporting affidavit; and (2) "the allegedly false statement is necessary to the finding of probable cause." *Id.* at 155-56. "It is not enough for defendants to show that the affidavit contains false information; in order to obtain a *Franks* hearing, defendants must make a 'substantial preliminary showing' that the false statements originated with the government affiant, not with the informants, or that the government affiant repeated the stories of the [informant] with reckless indifference to the truth." *United States v. Giacalone*, 853 F.2d 470, 475-76 (6th Cir.1988). "[T]he fourth amendment does not require 'that every fact recited in the warrant affidavit is necessarily correct, for probable cause may be founded upon hearsay and upon information within the affiant's own knowledge that sometimes may be garnered hastily.'" *Id.* at 476 (quoting *Franks*, 438 U.S. at 165). Thus, "[u]nder Franks, suppression is required only when the affiant deliberately lied or testified in reckless disregard of the truth." *Id.* at 477. Moreover, bald or conclusory allegations of deliberate falsity are not enough to warrant a *Franks* hearing. *Franks*, 438 U.S. at 171 ("To mandate an evidentiary hearing, the challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross-examine. There must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof.")

Defendant has made no showing of wrongdoing by the affiant, Agent Yotts, let alone the "substantial preliminary showing" required under *Franks* to receive a hearing to probe the veracity of the affidavits' allegations. Although Defendant maintains that the affiant's representations are "a complete fabrication," (Def.'s Mot. at 23), Defendant points to no facts set forth in the affidavits that were allegedly false or misleading. Instead, Defendant

takes issue with the affiant's conclusion—an opinion based on the facts that were set forth in the paragraphs preceding that opinion—that there was probable cause that Defendant was utilizing both the Lafayette Place apartment and the Marlborough Street residence in furtherance of his drug trafficking activities. The affiant's conclusion is merely an opinion and cannot legitimately be characterized as false or misleading. While Defendant may not agree with Agent Yott's opinion, it does not mean that the statement of his opinion was either false or intentionally misleading.

> In any event, there was a solid basis for such a conclusion. In the final three sales of heroin, Defendant either originated from [the residence] before or returned to [the residence] after the sales. Defendant placed the proceeds of each sale in his pocket and left the apartment, leading to the common sense conclusion that he likely took the proceeds of his narcotics sales with him to [the residence]. Defendant consistently had heroin to sell to the confidential informant and sold heroin to the informant on the six occasions in which he was contacted by the informant. Based on this, there was a fair probablity [sic] that Defendant had a ready supply of heroin, and based on the affiant's training and experience, persons involved in the distribution of large amounts of illegal narcotics maintain evidence of their drug dealing, including proceeds and records, at their homes [as well as other places used in the illegal distribution operation]. ([Pl.'s Resp.,] Ex. A at ¶ 16.) They also "use and maintain different places to conduct sales, packaging and storage of the illegal narcotic proceeds and narcotic distribution equipment." (*Id.* at ¶ 17.)

(Pl.'s Resp. at 14-15.) This Court agrees with the government and finds that Defendant has not made the requisite substantial preliminary showing that specified portions of the affiant's averments were deliberately or recklessly false.

Even if Defendant could make such a preliminary showing, he must also establish the second prong of the *Franks* analysis—that a finding of probable cause would not be supported by the remaining content of the affidavit when the allegedly false material is set aside. Although Defendant failed to address this prong, the Court finds that the remaining

portions of the affidavits are sufficient to establish probable cause. Accordingly, Defendant is not entitled to a *Franks* hearing.

### c. *Leon* Exception

Even if this Court were to find that the search warrants were technically defective or that the affidavits failed to establish probable cause, the execution of the search warrants fall within the good faith exception to the exclusionary rule.

The exclusionary rule does not bar evidence obtained by officers acting in reasonable reliance on a search warrant that is subsequently held to be invalid. *See United States v. Leon*, 468 U.S. 897, 905 (1984) (modifying the exclusionary rule so as not to bar from admission evidence "seized in reasonable, good-faith reliance on a search warrant that is subsequently held to be defective"). "[T]he relevant question is whether the officer reasonably believed that the warrant was properly issued, *not* whether probable cause existed in fact." *United States v. Hython*, 443 F.3d 480, 487 (6th Cir. 2006) (internal quotations and citation omitted) (emphasis in original). Where an officer's reliance on a warrant is objectively reasonable, the *Leon* Court held, no additional deterrent effect will be achieved through the exclusion from evidence of the fruits of that search. *See Leon*, 468 U.S. at 922. The *Leon* good faith exception, however, is inappropriate where: (1) the issuing magistrate was misled by information in the affidavit that the affiant either knew was false or should have known was false except for the affiant's reckless disregard for the truth; (2) the issuing magistrate failed to act in a neutral and detached manner; (3) the affidavit is so lacking in indicia of probable cause as to render official belief in the existence of probable cause entirely unreasonable; and (4) the search warrant was facially deficient

in that it failed to describe with particularity the things to be seized and the place to be searched. *Leon*, 468 U.S. at 914-15.

The *Leon* exception applies to the case at bar: there is no evidence of false information in the affidavits; no evidence that the magistrate abandoned his neutral and detached role; and no evidence that the warrant failed to particularize the items to be seized and the places to be searched. Based on the information provided by the informant, the surveillance and the efforts to corroborate the information, and the overall investigation into Defendant's activities is sufficient to establish that the agents were acting in reasonable reliance on the search warrants. Under these circumstances, a reasonable officer would have concluded that there was probable cause to search.

The Court finds that—assuming that the search warrants were technically defective and assuming that the affidavits failed to establish probable cause—the execution of the

search warrants fall within the good faith exception to the exclusionary rule.[7] Thus, Defendant's motion to suppress fails for this alternative reason.

### 2. Execution of the Search Warrants

Defendant next contends that—because the agents refused to provide him with a copy of the warrant prior to, during or after the search and because the agents failed to leave a copy of the warrant at the premises—the searches were conducted in an unreasonable manner. Assuming for purposes of this motion that Defendant's allegations regarding the

---

[7] The Sixth Circuit in *Frazier* held that:

[a]n officer's belief that there is a sufficient nexus between the suspected crime and the place to be searched is unreasonable when evidence in the affidavit connecting the crime to the residence is so vague as to be conclusory or meaningless. We previously found *Leon* applicable in cases where we determined that the affidavit contained a minimally sufficient nexus between the illegal activity and the place to be searched even if the information provided was not enough to establish probable cause. For example, we held ... that an officer relied in good faith on a warrant where the affidavit described the residence and the suspect's criminal scheme but connected the place to the illegal activity only by stating that the residence "was available" to the suspect. ... The affidavit [here] creates at least as strong a connection between the place to be searched and the evidence to be sought as the affidavits at issue in the foregoing cases. Paragraph nine of the affidavit states that [drugs were] found drugs in [the defendant]'s former residence ... shortly after he moved out. A reasonably well-trained officer could infer that a drug dealer who kept drugs in his former home would also keep drugs in his current home. Indeed, Agent Steward averred, based on his training and experience, that drug dealers usually continue their trade after moving to a new residence, and that people who sell drugs often keep drugs and guns in their homes. The inference that drugs would be found in [the defendant]'s new residence is all the more reasonable when considered in light of the Sixth Circuit cases cited in the affidavit, which stand for the proposition that, "in the case of drug dealers, evidence is likely to be found where dealers reside." And we think that Agent Steward's reliance on this proposition was particularly reasonable because the issuing magistrate returned the affidavit with instructions to add citations to additional authority supporting it. We hold that the Frazier affidavit was not so lacking in probable cause as to render official belief in its existence entirely unreasonable.

*Frazier*, 423 F.3d at 536-37.

agent's failure to provide him with a copy of the warrant and inventory are true,[8] there is no basis for Defendant's requested relief—suppression of all incriminating evidence found at the Marlborough Street residence and the Lafayette Place apartment. The procedural irregularities alleged by Defendant do not amount to constitutional defects nor do they render the search unreasonable, and such irregularities did not prejudiced Defendant.

The Sixth Circuit has consistently ruled that technical violations like those alleged here, even if proven, do not warrant suppression of evidence. In *United States v. McKenzie*, 446 F.2d 949 (6th Cir. 1971), for example, the defendant was not served with a copy of the search warrant while the search was taking place or even on the day of the search. The Sixth Circuit rejected the defendant's argument that, because the agents violated Rule 41 by not providing him with a copy of the search warrant, the search was defective. It stated, "[a]lthough important, the procedures required for execution and return of a search warrant, contained in [Rule 41], are ministerial. Absent a showing of prejudice, irregularities in these procedures do not void an otherwise valid search." *Id.* at 954; *see also Frisby v. United States*, 79 F.3d 29, 32 (6th Cir. 1996) (characterizing Rule 41's requirements as ministerial and refusing to suppress evidence when the defendant suffered

---

[8] The government notes that—when an individual is taken into custody, as Defendant was in this case—it is ATF standard practice to leave a copy of the warrant and an inventory of the items seized at the residence searched. The copy of the returns, which states "copy left on premises," indicates that this policy was followed during the searches of the Lafayette Place apartment and the Marlborough Street residence. (Pl.'s Resp., Ex. B.) Agent Yott admits, however, that a copy of the underlying affidavit supporting the application for the warrants was not provided to Defendant because the search warrant was sealed to protect the identity of the confidential informant, who could have been identified given that many of the controlled buys outlined in the affidavit had taken place just days before the search. This Court agrees with the government's position that Agent Yott's decision was reasonable and that his decision does not render the manner of the search unreasonable.

no prejudice). Here, Defendant suffered no prejudice and thus the remedy of suppression is unavailable for the alleged defects in the execution of the search warrants.

### B. Miranda

Defendant lastly contends that he was not advised of his Miranda rights prior to ATF's interrogation of him and, thus, any incriminating statements made must be suppressed. The ATF agent who questioned Defendant, Agent Yott, disputes this. Nevertheless, the government contends that "there is no need to conduct an evidentiary hearing to determine which account the Court should believe, [t]he old adage that 'the tape does not lie' definitively settles this issue." (Pl.'s Resp. at 18.) This Court agrees with the government: Agent Yott's tape recorded interrogation of Defendant confirms that there was no violation of Defendant's Miranda rights. (*See* Pl.'s Resp., Ex. C, WS_20001.WMA-WS_20006.WMA.)

Shortly before the search of the Marlborough Street residence, Defendant was pulled over for a traffic stop. During that traffic stop, Agent Yott informed Defendant of the searches, informed Defendant of his Miranda rights, and proceed to question him. Prior to answering any of Agent Yott's questions, Defendant stated that he understood those rights. (Pl.'s Resp., Ex. C, WS_20001.WMA, minute mark 00:35–01:15.) Agent Yott then asked Defendant if there is anything inside the house that could hurt the agents conducting the search, including firearms. Defendant stated, *inter alia*, that a firearm was located in the guest bedroom. (Pl.'s Resp., Ex. C, WS_20001.WMA, minute mark 01:15–03:20.)

Defendant was then brought back to the Marlborough Street residence and Agent Yott resumed questioning. Before additional questioning of Defendant took place, however, Agent Yott took the additional precaution of advising Defendant of his Miranda rights again

and having him initial an "ATF Waiver of Rights Form." (Pl.'s Resp., Ex. C, WS_20005.WMA, minute mark 00:16–02:35; Def.'s Mot. at 8.) Defendant "initialed several areas of the ... form, indicating he understood his rights, but refused to sign the waiver of rights." (Def.'s Mot. at 20.) During this second recitation of his rights, Defendant indicated that he wanted an attorney and all questioning immediately ceased. (Pl.'s Resp., Ex. C, WS_20005.WMA, minute mark 02:10–02:50.)

After Defendant invoked his right to counsel, he voluntarily provided the combination to his safe to avoid the agents having to use a safe cracker who might damage or destroy the safe by drilling into it. (*See* Pl.'s Resp., Ex. C, WS_20006.WMA, minute mark 00:01–02:30.) Defendant's statements regarding the safe was not in response to interrogation by AFT and Agent Yott made clear that Defendant understood that he was voluntarily providing this information even though he had previously invoked his right to counsel. (Pl.'s Resp., Ex. C, WS_20006.WMA, minute mark 00:01–01:25.)

As evidenced by the tape, this Court finds that Agent Yott's interrogation of Defendant—which included two separate recitations of Miranda warnings—was well within the bounds of the Constitution. Defendant's motion to suppress on this ground is, therefore, also denied.

**III. Conclusion**

For the foregoing reasons, Defendant's motion to suppress is DENIED.

s/Nancy G. Edmunds
Nancy G. Edmunds
United States District Judge

Dated: September 2, 2010

I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on September 2, 2010, by electronic and/or ordinary mail.

s/Carol A. Hemeyer
Case Manager